May it please the Court, in the post-Gaul, post-Booker era, due deference is not absolute deference. Mr. Mercer, do you have a name? I'm Bill Mercer. I'm the United States Attorney for the District of Montana. We're honored to have you here. Pleased to be here. A procedurally reasonable record should not mean that an affirmance for substantive reasonableness is a fait accompli. And finally, substantial reasonableness review is not so anemic that it will allow this sentence to stand. Counsel, as I'm sure you're very much aware, we have Whitehead. We also have one I'm familiar with, Autry, that our court has handed down that suggests that the district court indeed does have a fair amount of discretion, particularly when the probation is within the guidelines. It's obviously not usually done this way, but it's within the guidelines. Take Whitehead, for example. What's different between this case and Whitehead? First significant thing in this case is this defendant had a substantial criminal history. You didn't have that in Whitehead. You didn't have that in Autry. And particularly here, the criminal history relates to the conduct in this case, in that it was a major fraud that was committed in the state of Arizona. And then this defendant came to Montana and committed a series of major frauds, including false statements to banks and then attempting to conceal $445,000 of stock options. So the criminal history category here is very significant, and I think although it would be permissible to consider that, the district court didn't give that proper weight. And then I think the next thing to turn to is, frankly, the legislative history in the Sentencing Reform Act and what it says about general deterrence in white-collar cases. This certainly can be construed as a major white-collar case, given not only the background of this defendant in Arizona, but then what he did in Montana. You didn't have that history, and that history informs, I think, the significance of this offender as a white-collar offender. And when you look at the language in the briefing on what the Sentencing Reform Act said about the need to generate general deterrence in this context, major white-collar crime, we don't have that here. And then finally, the mitigation. Mechanically, you know, obviously you folks in the prosecutorial end of things and indeed the folks on the other side have to deal with the cases that we hand down, and we're trying to deal with Gall and Kimbrough and all the other things, try to understand what the Supreme Court had in mind. What should we be doing here? I mean, the court clearly talked about the issue of deterrence. The court was aware of the Arizona fraud, and yet the court decided that under the circumstances this was the way to go. Are you suggesting that even though the court was aware of it, took account of it, and decided differently, that we as a three-judge panel in the Ninth Circuit are obliged, following 3553A factors and sentencing factors, we're obliged to overturn that judgment? And if so, on what basis? Well, I think it's the distinction between procedural versus substantive review. And in this case, you're saying this is substantive, not procedural. Straight substantive. That's right. What are the guidelines in substantive review in this case? Well, I think we're developing a new common law of sentencing in this post-Gall-Booker era. This court has yet to have a published opinion reversing a below-guideline range sentence in the post-Circuit period. Has any circuit done that? Yes. In fact, I cite Pew in the Eleventh Circuit as a case where that has occurred. Take me through the thought processes as stated by the court in Pew in determining what is substantively an inadequate sentence. Well, I think, Your Honor, there is a weighing process of looking at factors that the district court relies on that are improper. And in this case, the judge said, I don't think general deterrence is relevant. Well, clearly that's improper because the Congress in legislative history said general deterrence is one of the primary answers. General deterrence he didn't think was relevant in this case. Right. Now, look, he's a tough judge, Malloy, isn't he? We have differences in terms of outcomes in some cases, Your Honor. I'm shocked. I'm shocked. He's a tough guy. He's a former Navy carrier pilot. He's been a judge now probably for 10 or 12 years there. And he applied the 3553 factors. He went through a long discussion of why he came to this conclusion. You want me to read it to you? I've read it. But, Your Honor, he can't. Pretty moving. Pretty moving, you know. But our goal is not to fill the prisons for this country. Our goal is to try to rehabilitate people. And this man impressed Judge Malloy that he was rehabilitated and there's no point in putting him in prison. He didn't kill anyone, did he? This is the same defendant, Your Honor. Are you going to answer my question? He didn't kill anyone. This is the same defendant, though, who committed a fraud crime in Arizona and then while on probation came to Montana and committed more crimes. But, you know, we have to rely on the good judgment of the district court. Not on what a prosecutor thinks ought to be the sentence. But back to Judge Baez's question in terms of weighing these factors. The first factor is did the district court rely on impermissible factors? And by ignoring general deterrence, the legislative history, Your Honor, says that white-collar crime, is a goal that we are to be trying to achieve. Sentencing guidelines have been declared unconstitutional. This isn't a guideline. This is what the Congress said in the legislative history of the Sentencing Reform Act. So this isn't a guideline issue. We know all of this. We know all of this. Here is a judge who had a very special case that he believes before him. And he believes that this man had nine years since that crime was committed. Am I right about that? The crimes that are charged in the indictment occurred in 99 and 2000. Yeah, nine years. And during that time, he's worked for various cities at low salaries. And he's performed a lot of good things. And the judge is convinced that he is rehabilitated. And there's no point in locking him up in a prison. Well, and the reason why the Congress focused on general deterrence is it's not just about this fellow. It is about what signaling effects are we going to have in major white-collar crime. And that's a negative in this record. You think all this is really going to stop at all? I believe the general, Congress. White-collar crime is proliferating. The legislative, right. And the legislative history says that if we give probationary sentences. Diligence on the part of the government to regulate activities, to enforce the laws, to enforce the securities laws of this country. And so in this case, we've done that. I know that. We brought this guy to justice. I know that. But you have a judge here. It's his judgment that we look at whether the sentence that he imposed was reasonable under the circumstances. And so we've got impermissible factors. You're looking at someone that's sentenced, me, thousands of people. And, you know, that is a very hard job to do. But substantive reasonableness indicates that the Supreme Court said to the Courts of Appeals, quote, you've got to even out some of these disparities. One of the ways, the remedy to try to make sure that we don't have unwarranted disparities is robust review by the Court of Appeals. We have plenty of disparities with the so-called sentencing guide. Right. And this is the way that we try to harmonize that. You know, this is how we try to harmonize it is by having review. Now, there are other factors that the district court relied upon that were permissible but that he gave undue weight to. And that goes to also this balancing test. So they are. If I could ask you, I want to get back a little bit. I want your help on this, on the policy issue. I appreciate your argument. I appreciate the government's concern. But on a slightly different perspective than Brother Ferguson, Brother Ferguson rather, I just, I am really struggling with how we reach what you're talking about. You talk about legislative history. You know there's a member of the Supreme Court that really started this whole ball game off in the first place with Booker Fenton, who hates legislative history. What legislative history are you referring to? The century format. Okay, so the century format. And who said what? Is that binding on us? What impact does it have? Well, certainly the Martin Courtney 11th Circuit thinks that it's very significant in terms of white-collar defendants. Is that a different one from Pew? Yeah. That predates Pew. But to your question, Judge Smith, and I understand we have artery out there. And I've listened to your back and forth with the AUSA from Oregon in that case. Here's the crucial thing, I think. You've got a statutory appeal right that the government has. It has to mean something. 3742B has to mean something. Booker, the remedial opinion in Booker says the way we're going to deal with sentencing disparity in the post-Booker era is to give the court of appeals the chance to harmonize what's going on. They need to look at this. And, of course, the government isn't bringing a lot of appeals. The Solicitor General has to approve them. And then I come here, if I've got one, and say, look at these factors in that we've got some factors that are given impermissible waiting to say that this case is true. Let's take one. What Solicitor General? Solicitor General of the United States. No government appeal can be taken without the authorization of the Solicitor General. Elena Kagan is the current solicitor. This was authorized by the Deputy Solicitor, Michael Dreeben, this appeal. So we're back to the concept, which I think you said before. In effect, we are developing a common law of sentencing. And it seems like after our cases that procedural reasonableness, we kind of have that squared away. So now we're in the era of substantive reasonableness, which all needs to be fleshed out. And you'd like us, I gather, to make this a case that helps to cabin how that works. This is the case to begin to draw the line. This is the case to say not only do we have legislative history, but we've got a waiting here. We've got a criminal history. This defendant, in all those other cases we've talked about. I hear what you say about it. Is that the best the government can do? Well, there are certainly other factors here. To the history? Well, this defendant committed a major crime in the past. That's got to be suggested. And as Judge Ferguson indicated, this judge went through in great length. I mean, the colloquy here is very, very lengthy. Reviewed all this, talked about Arizona, talked about all of the elements and so on, and clearly fulfilled all the procedural. That's procedural. Yeah. That's substantive. But the reality is, from his perspective, he took it into account and then concluded he was going to give the probation. For the life of me, I don't see how we can, to use your nomenclature, have a common law gloss on this thing and rely solely upon the legislative history. It's not just legislative history. It is the district court said specific deterrence, that's been achieved. Well, clearly, he committed this crime in Arizona, came to Montana and committed more crimes. Then we are, I believe you're asking us to say, well, I want you three to substitute your judgment for the district court's judgment. But that, at the end of the day, is what substantive reasonableness, that's what the Booker Remedy calls for. Remand with instructions to Judge Malloy to enter a sentence of two years in the federal penitentiary? No, I'm asking you to say this sentence is substantively unreasonable, based upon all the different factors in this case. Substantively, it isn't. And it's remanded saying this sentence is inadequate. On this record, this sentence is inadequate and you've got to resentence it. But a sentence of no incarceration on this record, given a guy who committed a fraud that generated a $3 million restitution judgment comes to Montana, is in bank, it files a bunch of false statements with banks, gets multiple loans from various banks, then files for Chapter 7 relief, does not disclose the existence of stock options, and then is asked by the trustee to turn those stock options over, refuses to do that, then talks to his stockbroker to say what's the value throughout the early months of 2000, and then sells them. The trustee could have potentially gotten more had he had authority to do that. And that clearly was beyond what should have happened during the Chapter 7. There's no doubt he did a lot of bad things. A lot of bad things. A lot of bad things. Yeah. A lot of bad things. But the judge has got to make the decision. And a lot of these bad things happened a decade ago. And in the interim, he's changed his life. Do you believe that people can get better? I mean, do you want punishment for the sake of punishment? No. Do you want punishment because if you punish this guy, the rest of the world is going to shake and be fearful? Is it going to do those things? General deterrence. The whole notion is that we're going to signal to others. I have opinion on that. I do. That doesn't work. General deterrence is the only hope of trying to get people to not commit white collar crime. If they look at this and say, you can commit a crime in Arizona. It can be so large that the restitution judgment is $3 million. Then you can come to Montana. You can apply for multiple loans. You can lie about your criminal history. You can lie about the fact that there's a restitution judgment. You can lie about the fact that you were in bankruptcy. And nothing will happen to you. You're passionate about this. Yeah. Yeah, you're passionate about this. You validate my belief that among the best lawyers in this country are found in Montana. You know that about that. We need a Montanan on the Supreme Court, a graduate of the University of Montana, to kind of balance out what's going on in this world. This is not a panel opinion. I want you to know that. What you want us to do is to reverse the sentence with instructions to Judge Malloy, indicating that he made an error in finding that there was no general deterrence to be served by a non-incarceration penalty. And secondly, to reweigh the other factors that you considered as to which you gave undue weight. Right. What else? He misweighed the specific deterrence category by saying that there's not a chance in hell that this defendant is going to commit another crime, given what this defendant's record was. He weighed a permissible factor impermissibly when he said that this is not a typical white-collar offender. This is a right down the middle of a plate white-collar offender. He made a mistake in comparing this defendant to Gall. Brian Gall, the Supreme Court case, I mean, Gall had no criminal history. He had withdrawn from criminal conduct well before he was charged in the case, before he was detected in the case. That's not this guy. This guy's busy avoiding what the trustee's asking him to do and then selling the stock options, having had this long history. And then obviously the big thing here is the fact that there's this major criminal history, which just, there's a statement in my brief, and I'm sorry I don't have a page reference for it, that says, for those that have committed crimes in the past, if they commit a subsequent crime, that should weigh heavily in terms of what's going to happen because he's got a propensity to commit crime. We know that. Punishment should go up in terms of gradation, not stay low if you've got a recidivist. But it seems like, I know we're into time, but one of the advantages we have as judges is we don't have to follow the time. Well, I'll stay here all day. I'll come back after me. You're familiar with U.S. versus Paul. Your office is pushing to overturn that. That was a substitute of unreasonable. This was a non-published opinion. Yes. We felt the judge hadn't completely violated the mandate. So we sent it back to a different judge to have it reheard, and now you're appealing that and so on. It seems like what the government seems to want is you're not so much concerned with the discretion of the district judge as you want maximum punishment within the guidance. You seem to be arguing that if the judge somehow gets out of the guideline formula, that it's just wrong, just flat-out wrong. Is that the government's position? No. In fact, Judge Baez said, are you asking me to remand this, this panel remand this, and to ask Judge Malloy to impose a two-year sentence? I know we wouldn't be here if this guy had gotten 18 months. We wouldn't be here if this guy had gotten 15 months in prison. We're here because he got no time in prison and he didn't spend a day in prison the first time when he got a slap on the wrist down in Arizona. The principle, I think, that I would say RETA stands for, Supreme Court's decision in RETA says if the sentence is within the guideline range, that's really the apex of the district court's discretion. If we've got the commission and the district court married up, if the sentence is within that guideline range, then although there may be, you just, this court just reversed in the Vasquez case, and that case the government hasn't asked for further review there because I think the government even in that case says that within guideline range sentence is even a reversal of that within guideline range sentence is not error. But certainly it is the government's position that with RETA, those sentences within the guideline range are ones that because the commission and the district court agree, are entitled to maximum discretion. Of course, that's not what we here have. But you seem to be arguing, Mr. Mercer, that if there's a variance or a departure, that it's somehow prima facie abuse of discretion. Is that the government's position? Not prima facie, but certainly both Booker and Gall say the farther the district court gets away from the guideline range, whether it's going up or whether it's going down, there is more scrutiny that's going to be implied in review. And you're saying that is our responsibility. We are to, in effect, put on the district judge's robes, and we are to judge it that it is substantively unreasonable, and you are referring us as the basis for that to a legislative history of the guidelines. Well, more than legislative history. What I'm trying to say is the fact that the judge said general deterrence is not applicable is inconsistent with the statute, not the guidelines, the statute. That's an improper factor. Then I'm saying there are other factors that are predictable. But you're saying that was procedurally unbalanced? No. That was procedurally unbalanced? It's all part of substantive review. Even though he said that didn't apply? Right. That's all part and parcel of the fact that this sentence is substantively unreasonable, and that's why I'm asking for a personal review. You're saying that the sentencing judge ought to keep his sentences or her sentences that are imposed within the guideline range. The government, Judge Ferguson, really stands, we understand what goal means, but the language in goal and Booker talk about due deference. I know what your view is. I know that there are going to be defendants who do not fit within the guideline range. They're going to be, we talked about Whitehead earlier. Whitehead's a guy who this court looked at that case, thought about taking it in bank. Whitehead's a guy who had family circumstances. Whitehead's a guy who had no criminal history. Whitehead's a guy who had a business that various employees were probably going to lose their jobs. I can see why in the Booker-Gaul regime that the district court can impose a sentence below the guidelines, but that's not what we're talking about in this case. We're talking about a guy that... Who really, under the guidelines, has the ultimate power of sentencing? What that sentence is going to be. The district court, this court owes the district court due deference, and there certainly is language in goal in Booker that says the district court is in the best position to make these judgments. But at the same time, that's juxtaposed with the remedy in Booker, which says, this court's got the ticket for substantive reasonableness review. And at the end of the day, that's the only thing that can make sure that we don't have unwarranted disparity among similar defendants who've committed similar offenses. You're telling me in this country we don't have disparity in sentencing? And I think that's what this remedy is designed to make sure it's not unwarranted. Are there any studies that tell us that that's the case? Well, certainly there are arguments that some districts have a lower downward departure rate than other districts. There are various downward departure rates. It all depends on who the district judge is. What's happening here is that these guidelines have been in effect for 30 years. And during that time, there probably, my guess is, there probably isn't a district judge on the bench today who sentenced under the prior regimen. So they're used to this. And this is what they learn about the sentencing guidelines when they go to the new judges school. And so a lot of them like it because they don't have to look somebody in the eye and impose a sentence. Well, here's your sentence. The guidelines call for 430 months to 395 months. So I'll give you the 395 months. So I'm exercising my discretion and I'm showing some compassion for you. That's the way it works today, right? That's the way it works today. There's no question. So the ultimate sentencing power is in the hands of the prosecutor. It is. No. It is. We're in the real world. Look at the great power that I was able to exert in this case. Yeah. This is tremendous. You finally ran up against a guy that's got a heart and a mind and he's got courage, you know. And he'll stand up to you. Judge, I know that you're worried about this kind of defendant. I mean, we have a system. I'm not worried about him. I'm worried about the system. In terms of fairness and equity, to have a guy that did this. I love fairness. I love equity. And you're one hell of a good lawyer, I'll tell you that. You may not know this, but I'm the guy that got the federal public defender system instituted in the state of Montana. You know why? Because you guys were just trampling all over these appointed defense attorneys that were, you know, in the last chance gulch and all those other places. And what was my friend's name over there that was the wrestling champion of Montana and Missoula? They got a street named after his father there. Yeah, I mean, he just had those defense attorneys totally Buffalo, you know. He really did. Mr. Mercer, may I get a word in edgewise? You made reference as your first point of substantive unreasonableness, Judge Malloy's finding that general deterrence is not relevant in the sentencing in this case. I'm having difficulty finding that. Can you give me? Excerpts of record 331. And Mr. Rhodes and I both submitted excerpts of records. So that page references to. I mentioned that is because on paragraph eight of additional facts justifying the sentence in this case, he specifically says that he knows that criminal restitution serves the penal objectives of deterrence. So are you saying that where he specifically finds the general deterrence is served by restitution? That is not enough. He should consider whether general deterrence will be served only by incarceration. And the basis of that is a legislative history of the sentencing government. Well, certainly, if restitution alone were to adequately advance general deterrence, then we essentially convert criminal cases to full cases because. Are you saying that there's something in the legislation which prohibits general deterrence to be effected only by restitution and not necessarily to include incarceration? That's my point. The passages that I cited in the government's opening brief, and I believe that is around 34, 30, yeah, 33 of the government's opening brief. The sentence report to the Sentencing Reform Act includes the following passage. It is our view that in the past there have been many cases, particularly in instances of major white-collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. That's on page 33. I understand that's the government's position, but let me see if I can phrase this accurately and precisely and get a yes or no answer from you. Are you saying that the district court judge does not have the discretion to meet the goal of general deterrence simply by restitution? Yes, that is what I'm saying. It would be inconsistent with the legislative history. The basis of that is the legislative history of the sentencing guidelines, which requires consideration of prison sentence, maybe not consideration, imposition of prison sentence for purposes of general deterrence. Correct. And I believe that this... Are you saying that we have to find as a matter of law that the failure to impose a criminal prison sentence in this case and achieving deterrence only by restitution is a violation of the statute of 7553A? Yes, it's inconsistent with the Sentencing Reform Act. And the significance of this is that if we were having a conversation about a guideline provision, I think Kimbrough stands for the proposition, the Supreme Court has said, district courts can take issue with policy judgments in the guidelines. But this isn't a guideline provision. This is the Sentencing Reform Act itself. And you would have us hold that a major white-collar crime requires prison to fulfill the general deterrence goal of the legislative history in every case where the white-collar crime is above a million dollars, $100,000? It would have to be substantial because that legislative history goes on to say that placing on probation of a white-collar criminal may be perfectly appropriate in cases in which only the rehabilitation needs of the offender are pertinent. Earlier, so clearly for lower level, if we were talking about a $15,000 case, if we were talking about a first-time offender in a $50,000 case, again, I wouldn't be here. But I'm talking about a guy who committed a $3 million crime who then comes to Montana and commits a crime where the loss amount calculated by the pre-sentence report and not contested in sentencing, the loss here exceeded $600,000. So it is a major crime. Is that a legislative function that you're asking us to perform? I mean, as Judge Bea indicated, you've got, you know, a million dollars, $100,000, $15,000. If we issued an opinion and said that having duly weighed all the evidence in this case, we find that the hereafter failure to impose a prison sentence as a matter of general deterrence for anyone who has a crime involving more than $15,000, wouldn't that be the height of, and I use this term because it's kind of a ludicrous term, judicial activism? It has to. There's no question that the facts of this case constitute major white-collar crime, and that's the extent of the government's argument. I can't say that the test should be at $100,000 or that the test should be at $150,000. This is the Potter Stewart definition of pornography, right? Yeah, it is. Is that really what we're talking about? Yeah, this is, you know when you see it, and this is the case where you draw the line. But nothing in the statute says that discretion is limited in one kind of case as opposed to another, and the term white-collar crime is not used in the sentencing guidelines. And I'm only talking about what the Congress said in 1984, because these passages go specifically to legislative intent on what the Congress wanted to achieve with the Sentencing Reform Act. So you eschew the view of legislative intent, which Justice Scalia says is simply what some people say, and don't get into the statute? Well, the significance here is this, as you'll recall, Congress spent years trying to figure out what to do to minimize unwarranted disparity, what to do to advance purposes of punishment. All the better to determine the legislative history. But the legislative history is huge. You know, if you print that thing off of Westlaw, the legislative history of the Sentencing Reform Act, it took a lot of time. The Judiciary Committee spent an extraordinary amount of time trying to develop a system. And although we've lost the guidelines, that legislative intent still informs. I know I'm well over. I did want to share. Let me tell you something. You know, when you get to be 86, you talk a little more than you should. But one of my best friends who passed away was a very prominent member of Congress and a leader in the House and a former Marine of mine. And I asked him one day, I said, Jim, when you voted on this bill, I think it was an environmental bill, I said, what was your legislative intent? He looked at me and said, what are you talking about? I said, well, what was your legislative intent? He said, why are you asking me that? I said, that's important when you decide cases. We have to find out what the legislative intent was. So I'm asking you, what was your legislative intent? He says, is that what the courts are looking for? Well, that's what they say that they're looking for. And he just laughed. He thought that was a joke because there's no such thing as legislative intent, you know. And finally, when I pressed him and I said, well, what was your intent? He said, my intent was to vote for the strongest bill that we could get under the circumstances. And the leadership told me and told all of us, this was the best that we could get. So we voted for it. That was our intent. As a matter of fact, Mr. Mercer, if you want to give us a 28-J letter, give us the names of every member of Congress who actually read the legislation. We would be delighted. I doubt any member of Congress ever reads any bill. And the only thing that I would, and I will look for a citation that may not get to that detail, but not all legislative history is created alike. And this is not equal to a lot of legislative history, given how much time they spent on this. The legislative history alone is pretty impressive. Let me, I know I need to sit down. I put a lot of that stuff in just for, you know, for the lobbyists and for their contributors, you know, stuff like that. I think it's the government's position, Your Honor, that they were very, they were really, the Congress was really concerned about the number of white-collar defendants who got straight probation. And that's really what's reflected here. That was one of the things they were saying to the commission is, we want you to increase penalties for economic crimes. I didn't give any of them straight probation. I put them in jail. And another thing we used to do in L.A. was they would go on and speak to business groups, Kiwanis, Rotary, and talk about the sins that they committed and why it was wrong of them to do that. And others went out and set up programs to help rehabilitate juvenile defenders, defendants, seriously. And they went out in the community and did a lot of good things. And, you know. And I think in Whitehead there was a significant community service component, which we don't have here. I mean, there's no fine. There's no. Look, I had an FBI agent who went into a bank and robbed it with a gun. FBI. You know what I gave him? Straight probation. Because I found out that he was a good agent. He was suffering because his marriage was breaking up. And he was in the depths of despair. He went in. He did this terrible deed. And then he went next door and waited to be arrested. And so I gave him probation. And I put in charge, his probation officer, a guy named McCarty, a former priest. McCarty and I, we knew each other well. And within a matter of a couple of weeks, this guy, he wasn't back at the FBI, but he was back at work. He straightened out his problems with his family. Never heard a word about this gentleman since. You know, I should have probably, you know, made an example of him for all the FBI agents that are doing things they shouldn't do, you know. And there are very few of them, if any. But we had these sentencing guidelines. I'd have you come before the Court of Appeals making a big lecture about how I didn't impose a 25-year sentence because otherwise that wouldn't be deterring others. You've got to take each case. We probably better let Mr. Rhodes come up. He's getting a full beard by the time we get up here. He's enjoying this, sir. Sure he is. You're talking about a significant mitigating factor, though. And that's one of the government's positions here, in orderly mitigation. No criminal history, no family ties, same thing with Whitehead, same thing with Ruff. It's not here. It's the judge that's got to make the decision. But here's what the Supreme Court said in reading it. It said in sentencing... Who said that? I'm not sure. It's the majority opinion. It's the majority opinion. Supreme Court reports that go on shelf to shelf. If you don't tell me who said it, I mean it. It's the majority opinion in reading it. But who said it? You're not prepared, huh? I didn't know I was going to get the question of who wrote it. I'm sorry. This is the majority. I've given you 25 minutes and nine seconds of time, okay? Can I just read this? Sure. In sentencing, as in other areas, district judges at times make mistakes that are substantive. At times they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur. And you're saying if not here, when? This is the time to draw the line. We have no published opinions in the circuit since Booker was decided in 2005. This is the case. Thank you very much. Thanks for coming over personally. We appreciate it. Yeah, yeah. Do you remember your address? Good morning. I'm John Rhodes from the Missoula Office of the Federal Defenders of Montana. I represent Duncan Edwards. I want to first respond to several of the points made by the government. It was suggested that if there's a sentence outside the guideline range, that there's heightened scrutiny. And I think the implication was that somehow this court should defer less because the sentence here was outside the guidelines. And the case law is clear, both at the Ninth Circuit and at the Supreme Court. And the Ninth Circuit case, most importantly, is CARDI, that it doesn't matter where the sentence is relative to the guidelines. It's the same amount of deference that's owed to the district court. But what perhaps changes is the district court has to explain why the guideline sentence wasn't appropriate in this particular case. Mr. Rhodes, can you conceive of any sentence that any district court judge can impose that is unreasonable? And if so, tell me where we can draw the line and how. Well, this court did that in Paul. So I think that's a case on point where it was just believed by this court that looking at the individual facts and the totality of those facts that the sentence imposed by the district court. Paul, with due respect, is a little unusual. That was a memorandum disposition, an unpublished opinion. It is even known simply because Judge Hall felt that the panel majority, of which I was a member, needed to publish our remand based on a failure to follow a mandate. So the precedent has nothing to do with substantive unreasonables. It has to do with a judge not following the court's mandate. The government has so conceded, I assume from Mr. Mercer's office on appeal in Paul, that it's not intended as a case of substantive unreasonables. It was certainly not the panel's intention. That was not the purpose of the published opinion. So you may need to rely on something other than Paul because Paul simply doesn't stand for the fact that that is a substantive unreasonables case. It is a mandate case. The unpublished memorandum opinion is the substantive unreasonables case. In the Indian Reservation case, a man kills five people, all of the same family, in brutal circumstances, and he's given probation. Unreasonable? If it was my client, Your Honor, I would probably argue differently. But speaking as a citizen, I would agree. There's got to be a line, right? Yeah. Bernie Madoff. If Bernie Madoff gets probation, I think overwhelmingly the country would feel that was unreasonable. Not only jurors. Do we have to take a public opinion poll? No. No, Your Honor. It's up to us as the judges. Correct, Your Honor. Give us some standards which we can use. Well, the standards are looking at the... It's got to be that there should be no appellate review of sentencing. Now, this is a novel procedure that we've had in the past 30 years, from the beginning of the Republic until 30 years ago. The sentencing power was in the trial judge. And as one of my law professors at Berkeley, Bold Hall, said that in an ideal judicial system, you want to put the best judges in the trial courts because that's where things happen. So... What's your answer to Judge Beha's question? The standards are there. What are those standards? The standard 3553A outlines the purposes of sentencing. The appellate review standard is due deference. Due deference or abuse of discretion? Both, Your Honor. It's a deferential review under an abuse of discretion standard, to use the legal terminology. And then, and critically, and this is what really counts here, you look at the individual circumstances that the district court relied on under a totality of the circumstances analysis. Do you agree with Mr. Mercer that Judge Malloy was wrong in saying that there would be no general deterrence value in putting a white-collar criminal who had committed over $3 million worth of fraud in Arizona and further fraud in Montana in jail for one day? Let me preface my response, Your Honor. I usually don't handle white-collar cases, so-called white-collar cases, before Judge Malloy because of my job. You're a town. Judge Malloy repeatedly, any lawyer in Montana that's appeared before Judge Malloy in a gun case, in a drug case, in a child pornography case, in an immigration case, has heard him say, I don't think there is any general deterrence being accomplished by this prosecution, by this sentence. Is he right in saying that? Personally, I agree, Your Honor, but the government's mistaken. It used the word irrelevant. I think that was the word that he spoke at. He said that in this case. In Judge Malloy's sentence. I don't think it has a significant factor in a case like this. And talking about, I will agree with Mr. Olney that the white-collar crime cases, general deterrence is more likely to occur than in something like the kinds of drug cases or others. But then he talks about, he doesn't think it's a significant factor in a case like this. He's talking about, you know, the guy standing in front of him. Exactly, Your Honor. And my point first, you made the, you just echoed what I said earlier. You look at the individualized circumstances here. But I really want you to get back to what Judge Baya asked you, because I'm struggling with the same thing as you could probably tell from my questions to Mr. Mercer. What is the standard? Cardi Zabala tells us we are not to wear the robes of the district judge. The district judge in the Supreme Court says, and I can't remember whether it was Rita or Gall or whatever, says that the district judge has a unique circumstance by being able to look at the demeanor of the witnesses, et cetera, et cetera, et cetera, and we're not supposed to substitute our judgment. So with all of that in mind, what are we doing here? I mean, the reality is the government has made its position known as to what it thinks it is and told us where he thinks we ought to look to get some substance. From your perspective, from the defense bar perspective, what is the standard? I gather you're not saying that we're going to rely entirely on the district judge because there are going to be cases where you're not going to like what the district judge does and you're going to say it's substantively unreasonable because it goes too far the other way. So what is the standard that we should be creating, looking for, finding in, what did Goldberg call it, the penumbra of the emanations from the Ninth Amendment? Wherever we find it, where does it come from? What I personally think is developing in the case law is what I think Mr. Mercer is concerned with, that given the directives by the Supreme Court adopted by this court in Cardi, what's happening is effectively is the deference to the district court so that this court is greatly hesitant, almost never going to interfere with the district court. And if we do, on what basis do we do it? Like Judge Bay gave the example of the multi, I think he said five murders in a reservation. Is that enough? Yes, I would think so. That wasn't my client. Okay. So how do we create this? How do we craft this language? What is the standard that we're supposed to be creating here? I think this court should do what Judge Malloy did so commendably well here, is look at each of the 3553A factors and under a deferential standard, and that's the hard part, is in essence going to have to re-weigh the facts. Didn't Judge Malloy do something erroneous with respect of the general deterrence issue? Stay with me for just a second. I just heard what my brother Preggerson read from the record, and he said that general deterrence is not a significant factor in a case like this. That's what Malloy said. In a case like this. And then he went to the personal circumstances of Mr. Edwards. Now, was he in error in considering the personal circumstances of Mr. Edwards that he might not reoccur in crime, rather than thinking about whether the general deterrence, what the public would see as a result of this man not being put in jail? He was not in error for two reasons. So what I'm saying is, did he err in making the determination that general deterrence was not significant in a case like this by concentrating on Mr. Edwards' personal circumstances rather than the public perception of a white-collar criminal not going to prison? No, for two reasons. One, Your Honor, this isn't a Wall Street crime that's going to catch the attention of the New York Times, the Washington Post, the Wall Street Journal. Not that Montana catches the attention of the Wall Street Journal or the New York Times. I'll stipulate. That's not true. That's not true. So in that instance, he's saying good things happen in Montana and good things don't get in the newspaper. That's also true. Our football team gets good coverage, Your Honor. And Judge Fragerson says the Supreme Court justice is going to come from Montana too, so we ought to put that in the record. All right, that's the first reason. Not a Wall Street crime. What's the second reason? And he looked at how general deterrence would work in this case, and he acknowledged that in Livingston, Montana, where Mr. Edwards, after he reformed his life, which he did prior to being indicted, which was an important fact to Judge Malloy, he was the building inspector. His boss knew about it. People in the community knew about it. So Judge Malloy acknowledged that perhaps there is general deterrence for that community in Montana. Mr. Edwards has now retired from that job. He lives in Oklahoma where he's serving in a similar capacity for a retirement community, and Judge Malloy acknowledged with respect to those individuals who were made aware of this as a result of the prosecution and the sentencing, which is certainly part of the punishment, the shame that's involved. I don't think the government truly appreciates how much punishment is inherent in the prosecutorial process. I see that when I deal with my clients on a daily basis. I don't think the government appreciates how much punishment is inherent in probation. It pays lip service to the fact that the law recognizes probation as punishment, but it doesn't acknowledge at a human level how much punishment is inherent in that status in our country. So Judge Malloy acknowledged that there is general deterrence in a case like this for those isolated communities. I think he was distinguishing white-collar cases in the general public sense of what kind of case you think of, which Bernie Madoff being the penultimate example, compared to what are deemed white-collar cases in Montana, which for the most part do not pale in comparison on the scale of New York. Can we really seriously be taking the idea that because something is of particular notoriety that that's what we have to go on? I mean, what about blogs? What about the relative market concept? Is the market Montana? Is the market a town in Montana? What does the New York Times have to do with it? I mean, that's my problem with all of this. This is a real slippery slope. Where do we set the standard? Now, what seems to make sense is the fact that Judge Malloy said he acknowledged the general deterrence, but he said in this case I see these factors and they weigh in a particular way and then went from there. At least then the district judge acknowledged the requirement to consider it and then focused on the individual and made the determination. And that's why there are standards. 3553A is a national standard, so I would consider general deterrence generally to be national. But 3553A is really more the procedural aspect, isn't it? Well, it's the purposes of sentencing. It's what is hoped to be accomplished. But in order to satisfy procedural reasonableness, you've got to kick off all the 3553A factors. If not, literally, it's clear that you have done so. Which here, Judge Malloy literally did. I think the thing that we forget is that there's a human relationship, a sense of personal relationship between particularly in a community like in Montana where between the judge and the defendant. And he did get some house arrest time, didn't he? Yes, Your Honor. And he's on probation for how many years? The maximum term, five years. Five years. So during that time, he's going to be under the close scrutiny of the probation office. If there's a violation, it will be brought back to Judge Malloy. And Judge Malloy has put his best judgment following 3553 analysis. And he's going to keep an eye on this defendant. And the defendant knows that the judge has placed some faith in him. And the judge senses that that relationship has been established. They're just sort of human interpersonal relationships that develop. And so this is a very hard to define process. Some judges don't care. But Judge Malloy strikes me, from what I read, as someone who does care. So it's, you know, we're dealing with human beings. Nothing's perfect. Except the three judge panels in this case. Judge Bay, I've given you another example in this court's own case law, the Vasquez case. I believe it's an illegal reentry case. The aggravated felony was 28 years old. And nonetheless, the district court sentenced under the illegal reentry guideline, applied the aggravated felony enhancement, and this court vacated and remanded that sentence as being unreasonable. And perhaps that's ultimately the problem here is the reasonableness standard, which obviously isn't isolated to federal sentencing review. It's littered throughout the law, and that's a difficult standard. I can understand very well, in the Madoff case, in the five Indians slaughtered on the reservation case, that standard of remand to the district court could be met by not an unreasonable standard, but by an outrageous standard. It could shock the conscience of the court, right? Correct. But that's not what Congress said, and that's not what the Supreme Court says. They say apply an unreasonable standard, which is much easier to reverse than a shock to the conscience of the court or an outrageous standard. Do those words have any meaning? I don't know what meaning we can give them. And the complicating factor, I think, is unreasonable standard under abusive discretion review. I think that makes it that much more complicated for the bench. If I could touch upon our restitution argument, and I don't know if I've ever done this as a lawyer, and I'm somewhat arguing against my client, because if we lose on the restitution argument, then that bolsters the reasonableness of the sentence imposed by Judge Malloy. Are you prepared to stipulate on that, then? I don't know if I'd go as far as a stipulation, but I am recognizing if we lose that, I think that On the other side, the government didn't bring up anything about restitution, so you're in rebuttal, so we don't need that. Just submit it on your briefs. All right, we will submit it on our briefs. If there's no further questions, thank you. All right, any rebuttal? One minute. Yeah, the longer you're here, the more I like you. Come on up here. All right. I just want to make a quick reference to the passage in our brief on page 32, where I note another passage, a quote from the legislative history, which says, The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white-collar crime. Major white-collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business. And that, I think, supplements that earlier passage that I mentioned. I really think that the notion that general deterrence is only applicable where the defendant lives and somehow that general deterrence wouldn't apply to bankruptcy lawyers who are counseling their clients to say, Now, you're the debtor in this Chapter 7. You need to tell the court everything that's relevant. If the paperwork says, Disclose your assets, you need to disclose them. If the paperwork says, If there are any material changes, you need to disclose them. Because if you won't, if you don't, then it very well may be that, A, the United States is going to prosecute you, and, B, you're going to actually be incarcerated. The fact that that incarceration would occur is the kind of thing that will affect people's behavior. That's the whole notion of this general deterrence. And what the court said about, Well, there are people in Livingston, Montana, that knew he was prosecuted and maybe they were affected, it certainly is inconsistent with what is in the Sentencing Reform Act. I don't think we need to have a Bernie Madoff crime in order to take general deterrence as an important principle. I think it can be a quarter of a million dollar fraud in Montana or a larger state. The fact is, if people perceive that, A, if they do it, we'll investigate it. If we investigate it and we can prove it, we'll charge it. If we charge it, we'll have a viable case and we'll get a conviction. And if we get a conviction, it isn't merely going to be slap on the wrist, pay the money back. It's going to be, there'll be actual consequences to your behavior. That general deterrence... Sounds like an argument why we should pay taxes. Indeed. Indeed. And I guess... Why when we execute murderers doesn't murderers stop? Well, you know, I agree with you, I agree with your principle, Judge. Or why we've got jails still with people involved in drugs. Why doesn't that stop? You're right, Judge. There are some categories where I would not stand at this podium and say general deterrence is an important concept. If we were here on a meth case, I wouldn't say, boy, you know, we really need to lock up this guy so we can affect others. You're just finding out, you know, well, I mean, I've known it for a long time. You're just finding out that, well, that the, you know, in the business area, there are a lot of crooks out there. You know, there are more crooks than good guys in this world. It's all over the world, right? All over the world, yeah. It's less here, much less here. And there's, you know, there's a lot of things I'd like to see deterred. I'd like to see the lobbyists deterred. I'd like to see lies that circulate deterred. You know, that's the kind of society we live in. Well, we know that we miss a lot of cases. We know that we do. But when we get one and when we move it through the system, investigation to charging to conviction, if we get to sentencing and there isn't any implication, particularly when the person got away with probation the first time around, anyone who's aware of this record would say this does not promote respect of law, back to 3553A. And we're not, we have no chance of affecting people's behavior if they believe that they have. How about all these bank accounts that are, you know, offshore? The biggest corporations in this country aren't paying their fair share of the taxes. The people that pay their fair share of the taxes are the working people because it comes right out of their salary, you know. And they're the ones that get the short end of the stick most of the time. What about the role of the real restrictions that some of the district courts impose on the parole situation? Like in Ottery, you may recall that there were just all kinds of things. In effect, there was a prison, but it was not a jail. In this situation, you have a little less, but there are certainly a number of significant conditions. Does the government believe that the conditions imposed by a district court in a parole situation should have any bearing on our consideration of this issue? Yes. I mean, I think that what Justice Stevens says in Gall is certainly different than the system. Had I been arguing it here in 2004, I would have been saying to you, I don't believe that you can get any... This court can't look at probation, community confinement, or let's just say a probation. You can't look at probation and say that's a significant crime. But the Supreme Court said otherwise. The Supreme Court said that's a factor. And so I will recognize that. But, you know, I think it's got to be harmonized on this record. You've got to look at everything else. If you're going to take away the Arizona offense, you might not be standing here. You know, I think take away the criminal history, take away what the court said about general deterrence, and we're looking at Whitehead. But this isn't Whitehead. It's not Ruff, it's not Whitehead. This is a very different case. And that's why I think this is the place you can draw the line. But isn't it interesting here that Mr. Edwards, like today, he's working for a local government... He's not doing that anymore, Your Honor. I think Mr. Rhodes, he doesn't live in Livingston anymore. He retired from that job and moved to Oklahoma. Well, I mean, he's working in Oklahoma. I don't... Yeah. Okay, so he's... You know, he's still on probation. The people that he works for, I think it's the city, they know about his background. And yet, somehow, he has got certain qualities that people will hire him, and he'll work in this building inspection business, and they've got confidence in him. You know, that's not easy for someone with a criminal record to accomplish. Most of the people with a criminal record, they're really... They get out in the world. They have a very, very hard time of getting a decent job. And then they go downhill after they're out. They just sort of give up. And... But he apparently has been able to find good jobs where people knowing about his background have faith in him, that he's going to do a good job for them, and that his talents are needed. I mean, that's... You know, and probation is punishment, too. There's no question about that. Well, I just would ask the court to look at this mitigation case compared to what you were talking about with the FBI agent, or what, Judge Smith, you were looking at at Autry, or what the in-bank court thought about... what the court thought about with Whitehead. That example, because there's this communication that goes on between the judge and the defendant. And that's why I think it's important that we follow an abusive discretion standard on reasonableness. And here you have a judge that went through the 35-53 factors. So... And you have to think about the particular judge involved, too. All right. Thank you very much. Thank you very much. Appreciate your time. Pleasure to have you here. Nice to see you all. Pleasure to have you. Are you in Billings now? Yeah, I am. Yeah. How long have you been the U.S. Attorney there? 80 years. 80 years? Seems like it. Mr. Rhodes, how long have you been in Missoula? A couple years, Your Honor. You know, I sat as a district judge there for years. And I see you over there at times. He was really fishing, but... Oh, I wasn't fishing. I never caught a fish. But Missoula's just a wonderful city. Yeah. It's growing. The downtown's changing. Yeah, I'm afraid about that. Okay. I'm going to try to get back there this year just to look around. All right. We'll take the last one. Number... Did we submit that last one? Jackson? What? No, Jackson. Oh, no, no. I'm talking about this. Oh, the last one. Submit it. Yeah. Oh, yeah. Okay. All right. Let's submit it.
judges: Pregerson, Bea, Smith M.